UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| SHEILA GARVEY,<br><br>        Plaintiff,<br><br>v.<br><br>OGDEN CLINIC PROFESSIONAL CORP., a Utah professional corporation; and COLUMBIA OGDEN MEDICAL CENTER, INC., a Utah corporation dba Ogden Regional Medical Center,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br>**(DOC. NOS. 116 & 120)**<br><br><br>Case No. 1:22-cv-00077<br><br>Magistrate Judge Daphne A. Oberg |

Dr. Sheila Garvey brought this action against Ogden Clinic Professional Corp. ("Ogden Clinic") and Columbia Ogden Medical Center, Inc. (the "Hospital"), after Ogden Clinic terminated her employment.[1]  Dr. Garvey asserts claims against both defendants for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with business relations, libel and defamation, gender discrimination under Title VII of the Civil Rights Act of 1964,[2] and age discrimination under the Age Discrimination in Employment Act[3] ("ADEA").[4]  Ogden Clinic and the Hospital each

---

[1] (*See* Am. Compl., Doc. No. 45.)

[2] 42 U.S.C. §§ 2000e, et seq.

[3] 29 U.S.C. §§ 621–634.

[4] (*See* Am. Compl., Doc. No. 45.)

1

moved for summary judgment on all claims.[5]  After full briefing, the court held a hearing and took the motions under advisement.[6]  Because the defendants have shown no disputes of material fact exist, and they are entitled to judgment as a matter of law on all claims, the motions are granted.

## SUMMARY JUDGMENT STANDARD

Courts grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."[8]  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."[9]  In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."[10]  But, "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts

---

[5] (Def. Ogden Clinic Pro. Corp.'s Mot. for Summ. J. ("Ogden Clinic MSJ"), Doc. No. 116; Def. Ogden Reg'l Med. Ctr.'s Mot. for Summ. J. ("Hospital MSJ"), Doc. No. 120.)

[6] (*See* Min. Entry, Doc. No. 148.)

[7] Fed. R. Civ. P. 56(a).

[8] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (citation omitted).

[9] *Id.* (citation omitted).

[10] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."[11]

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[12]

## RELEVANT FACTS[13]

Dr. Garvey was hired by Ogden Clinic in 1999 as a general surgeon to provide surgical care to patients.[14]  She entered into an employment agreement with Ogden Clinic, which defined the terms of her employment.[15]  This agreement required Dr. Garvey to "meet the performance standards and clinic and call schedule requirements

---

[11] *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

[12] Fed. R. Civ. P. 56(c)(1).

[13] All facts the court considers come from the parties' briefs and accompanying exhibits. The court draws all reasonable inferences in favor of Dr. Garvey as the nonmoving party.

[14] (Ogden Clinic MSJ, Statement of Undisputed Material Facts ("SUMF") ¶ 1, Doc. No. 116.)

[15] (*Id.*; Ex. A to Ogden Clinic MSJ, Employment Agreement, Doc. No. 117-1.)

of [her] specialties as set forth by [Ogden Clinic]."[16]  The clinic could terminate the

agreement "for cause" by giving Dr. Garvey written notice of the grounds for

termination.[17]  According to the agreement, "cause" included "failure to work up to

established levels of performance as determined by [Ogden Clinic]," and "breach of a

material term" of the agreement by Dr. Garvey.[18]  Either party could terminate the

agreement without cause "upon ninety (90) days written notice to the other party."[19]

Dr. Garvey has held privileges to practice medicine at the Hospital since 1998.[20]

Before 2012, the Hospital contracted directly with Dr. Garvey to perform services

there.[21]  Beginning in 2012, the Hospital entered into a professional services agreement

("PSA") with Ogden Clinic to provide surgical services, including trauma call services in

its emergency department.[22]  The PSA is "between Columbia Ogden Medical Center,

Inc. d/b/a Ogden Regional Medical Center ('Facility') and Ogden Clinic, PC

---

[16] (Ex. A to Ogden Clinic MSJ, Employment Agreement § 1.2, Doc. No. 117-1.)

[17] (*Id.* § 7.2.)

[18] (*Id.* § 7.2(k), (m).)

[19] (*Id.* § 7.1.)

[20] (Hospital MSJ, Statement of Undisputed Facts ("SUF") ¶ 27, Doc. No. 120.)

[21] (*Id.* ¶ 14; Ex. 7 to Hospital MSJ, 2001 Professional Services Agreement ("2001 PSA"), Doc. No. 121-7.)

[22] (Ogden Clinic MSJ, SUMF ¶ 5, Doc. No. 116; Hospital MSJ, SUF ¶ 13, Doc. No. 120; Ex. 6 to Hospital MSJ, Professional Services Agreement ("PSA"), Doc. No. 123-1 (sealed).)

('Contractor')."[23]  The operative PSA was set to expire on November 30, 2022, "[u]nless sooner terminated."[24]  The termination clause permitted either party to terminate the PSA without cause on sixty days' notice.[25]

Under the PSA, Ogden Clinic agreed to provide twenty-four-hour medical coverage, on an on-call basis, to the Hospital's emergency department patients in the specialty of trauma ("trauma call service").[26]  The PSA required Ogden Clinic to provide this coverage "in accordance with [the Hospital's] Bylaws, Rules and Regulations and Policies and Procedures and in accordance with the call schedule maintained by [the Hospital]."[27]  According to the PSA, the Hospital would "neither have nor exercise any control or direction over Contractor's medical judgment or the methods by which Contractor performs Services."[28]

Ogden Clinic's general surgeons (including Dr. Garvey) provided coverage for the trauma call service.[29]  At the time of her termination, Dr. Garvey and her general surgeon partners each participated in the trauma call service rotation on a "one in four" basis, meaning each surgeon took one day of call per week, and one full weekend of

---

[23] (Ex. 6 to Hospital MSJ, PSA 1, Doc. No. 123-1 (sealed).)

[24] (*Id.* § 3.A.)

[25] (*Id.* § 3.B.)

[26] (*Id.* at 1.)

[27] (*Id.* § 1.A.)

[28] (*Id.* § 5.D.)

[29] (Ogden Clinic MSJ, SUMF ¶ 8, Doc. No. 116.)

call per month.[30]  But Ogden Clinic physicians had previously changed this schedule to

accommodate individual physicians during extended periods of unavailability.[31]  For

example, other physicians covered one physician's shifts during his year-long

deployment, and two other physicians who became pregnant had their shifts covered for

one year and three years, respectively.[32]

Beginning in 2018, the Hospital received a series of complaints from nurses

regarding Dr. Garvey's conduct, including five complaints between March 2018 and

November 2019.[33]  These included complaints that Dr. Garvey was "rude," "abrasive,"

and "belittling," she yelled and swore at a nurse, and nurses were "terrified of her."[34]  In

December 2019, the medical staff president told Dr. Garvey the medical staff's

leadership council would meet with her the following month to discuss a Performance

Improvement Plan ("PIP") due to "recent reports where [her] actions and

communications have been perceived disruptive and unprofessional."[35]  After meetings

with Dr. Garvey in January and February 2020, the leadership council implemented a

---

[30] (*Id.* ¶ 9; Ex. D to Ogden Clinic MSJ, Dep. of Sheila Garvey, M.D. ("Garvey Dep.")
104:22–105:13, Doc. No. 117-6.)

[31] (*See* Mem. Opposing Def. Ogden Clinic's Mot. for Summ. J. ("Opp'n to Ogden Clinic
MSJ"), Pl.'s Resp. to Statement of Undisputed Facts ("RSUF") ¶ 9, Doc. No. 132.)

[32] (*Id.*; Ex. 1 to Opp'n to Ogden Clinic MSJ, Garvey Dep. 106:4–19, 107:6–14, Doc. No.
135 at 4–57.)

[33] (Hospital MSJ, SUF ¶¶ 41–49, Doc. No. 120.)

[34] (*Id.* ¶¶ 46–48.)

[35] (*Id.* ¶ 50.)

PIP which included attendance at a program for "distressed physicians."[36]  Dr. Garvey

began that program in May 2020 and completed it in November 2020.[37]  In December

2020, the Hospital received a complaint from a patient about Dr. Garvey's

"professionalism," and three nurses complained Dr. Garvey "yelled" at them and made

disparaging and belittling comments during one incident.[38]

In January 2021, the Hospital informed Ogden Clinic it was "no longer willing to

allow [Dr. Garvey] to participate on the trauma general surgery call rotation as of

February 28, 2021."[39]  The Hospital also informed Ogden Clinic that removing Dr.

Garvey from the trauma call service was a condition of continuing the PSA between the

Hospital and Ogden Clinic.[40]

On February 18, 2021, Ogden Clinic terminated Dr. Garvey under the "for cause"

provision of her employment agreement.[41]  In Dr. Garvey's termination letter, the clinic

listed several grounds for termination including "breach of a material te[r]m of this

---

[36] (*Id.* ¶¶ 51, 55.)

[37] (*Id.* ¶ 57.)

[38] (*Id.* ¶ 59–60.)

[39] (Ex. E to Ogden Clinic MSJ, Hospital Trauma Call Letter, Doc. No. 117-8; Ex. C to Ogden Clinic MSJ, Dep. of Kevin Porter ("Porter Dep.") 72:8–74:8, Doc. No. 117-3.)

[40] (Ex. E to Ogden Clinic MSJ, Hospital Trauma Call Letter, Doc. No. 117-8; Ex. C to Ogden Clinic MSJ, Porter Dep. 84:11–16, Doc. No. 117-3.)

[41] (Ogden Clinic MSJ, SUMF ¶ 14, Doc. No. 116.)  Technically, Dr. Garvey resigned her employment in lieu of termination, the same day she received the termination letter. (*See id.* ¶ 15.)  But Ogden Clinic "does not dispute that [Dr. Garvey's] employment was effectively terminated."  (*Id.* at 4 n.1.)  Because all parties refer to Dr. Garvey's "termination" through throughout their briefing, this term is used here.

Agreement by Employee."[42]  The letter explained: "Specifically, [the Hospital] is no longer allowing you to participate on the trauma general surgery call rotation.  As a result, you fail to meet the call schedule requirements of Section 1.2 of the Employment Agreement."[43]

Additional facts relevant to particular claims are set forth in the analysis section below.

## ANALYSIS

A.  Breach of Contract

To prevail on a breach of contract claim under Utah law,[44] a plaintiff must show "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[45]  "The interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent (which is a matter of fact) is necessary to establish the terms of the contract."[46]  "[A] contract provision is not necessarily ambiguous just because one party

---

[42] (Ex. F to Ogden Clinic MSJ, Termination Letter, Doc. No. 117-9.)

[43] (*Id.*)

[44] The parties agree Utah law governs Dr. Garvey's contract claims.  (*See* Ogden Clinic MSJ 7–13, Doc. No. 116 (citing Utah law); Hospital MSJ 22–31, Doc. No. 120 (same); Opp'n to Ogden Clinic MSJ 10–16, Doc. No. 132 (same); Mem. Opposing Def. Ogden Reg'l Med. Ctr.'s Mot. for Summ. J. ("Opp'n to Hospital MSJ") 10–11, Doc. No. 140 (same).)

[45] *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388.

[46] *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991).

8

gives that provision a different meaning than another party does.  To demonstrate ambiguity, the contrary positions of the parties must each be tenable."[47]

    1.  *Breach of Contract Claim Against Ogden Clinic*

Dr. Garvey claims Ogden Clinic breached her employment agreement because it lacked valid cause to terminate her, and it failed to provide the requisite ninety-day notice for termination without cause.[48]  Ogden Clinic asserts there is no genuine dispute that it terminated Dr. Garvey for failure to meet the call schedule requirements of the employment agreement.[49]  Ogden Clinic contends this constitutes valid cause for termination under the agreement.[50]

Dr. Garvey's employment agreement with Ogden Clinic required her to "meet the performance standards and clinic and call schedule requirements of [her] specialties as set forth by [Ogden Clinic]."[51]  The agreement also permitted immediate termination "for cause"—defined to include "breach of a material term of this Agreement by [Dr. Garvey]."[52]  Ogden Clinic contends Dr. Garvey could not meet the call schedule requirements because the Hospital disallowed her from participating in the trauma call

---

[47] *R & R Energies v. Mother Earth Indus.*, 936 P.2d 1068, 1074 (Utah 1997) (citation omitted).

[48] (Am. Compl. ¶ 113, Doc. No. 45.)

[49] (Ogden Clinic MSJ 5–6, Doc. No. 116.)

[50] (*Id.* at 6–7.)

[51] (Ex. A to Ogden Clinic MSJ, Employment Agreement § 1.2, Doc. No. 117-1.)

[52] (*Id.* §§ 7.2, 7.2(m).)

rotation.[53]  And it asserts Dr. Garvey breached a material term of the agreement by way

of her inability to meet the call schedule requirements, which constituted "cause" for

termination under the agreement.[54]

Dr. Garvey contends a reasonable jury could find she did not breach the

employment agreement because she never failed to satisfy any trauma call shift for

which she was scheduled.[55]  She also contends Ogden Clinic had "no basis to suppose

or speculate" that its trauma call service would be interrupted since, in the past, Ogden

Clinic physicians had covered trauma call shifts for physicians who were unavailable for

extended periods (up to three years).[56]

Dr. Garvey fails to demonstrate any ambiguity in the contract terms at issue.  The

provision requiring Dr. Garvey to meet "the call schedule requirements of [her]

specialties as set forth by [Ogden Clinic]"[57] can only plausibly be interpreted to include

an ability to participate in the trauma call schedule.  When the Hospital prohibited Dr.

Garvey from participating in the trauma call schedule, Dr. Garvey was necessarily

unable to meet the call schedule requirements under her employment agreement.  Dr.

Garvey's assertion that she still met the call schedule requirements even though she

could no longer be scheduled on the trauma call rotation is untenable.

---

[53] (Ogden Clinic MSJ 6, Doc. No. 116.)

[54] (*Id.* at 6–7.)

[55] (Opp'n to Ogden Clinic MSJ 7, Doc. No. 132.)

[56] (*Id.* at 7–8.)

[57] (Ex. A to Ogden Clinic MSJ, Employment Agreement § 1.2, Doc. No. 117-1.)

Dr. Garvey does not dispute that this provision constituted a material term of the agreement.  This means her inability to meet the call schedule requirements breached a material term of the agreement—and a material breach is "cause" for termination under the agreement.  Accordingly, based on the undisputed facts and the unambiguous terms of the employment agreement, Ogden Clinic had valid cause to terminate Dr. Garvey.

Evidence that Ogden Clinic physicians had covered other physicians' call shifts for extended periods does not change this analysis.  Under the unambiguous terms of the agreement, Dr. Garvey's inability to participate in the trauma call schedule constituted cause for termination.  The fact that Ogden Clinic (or its physicians) chose to accommodate other physicians who were unable to participate does not negate the existence of valid cause.

Accordingly, Ogden Clinic is entitled to summary judgment on Dr. Garvey's claim for breach of the express terms of the employment contract.

### 2. *Breach of Contract Claim Against the Hospital*

Dr. Garvey brings a breach contract claim against the Hospital under the PSA and three Hospital policies.[58]  Each is addressed in turn.

---

[58] (*See* Am. Compl. ¶¶ 116–22, Doc. No. 45.)  Dr. Garvey also alleged she had a contract with the Hospital to act as Trauma Medical Director.  (*Id.* ¶ 117.)  But she does not dispute that this contract expired nearly a year before she was terminated, (*see* Hospital MSJ 27, Doc. No. 120), and she makes no argument regarding this contract in her summary judgment briefing.  Accordingly, Dr. Garvey has abandoned her claim based on the Trauma Medical Director contract.

i.  PSA

Dr. Garvey claims she is either a party to or a third-party beneficiary of the PSA between Ogden Clinic and the Hospital.[59]  And she contends the Hospital breached the terms of the PSA by barring her from participating in the trauma call rotation.[60] Specifically, she claims the Hospital violated the provision prohibiting it from exercising "any control or direction over . . . the methods by which Contractor performs Services."[61] The Hospital argues Dr. Garvey was neither a party to nor a third-party beneficiary of the PSA.[62]  The Hospital is correct.  Under the plain language of the contract, Dr. Garvey was not a party or a third-party beneficiary.

By its own terms, the PSA is an agreement "entered into between [the Hospital] ('Facility') and Ogden Clinic, PC ('Contractor')."[63]  "Contractor" is defined as:

> (i) an individual physician licensed to practice medicine in the State in which the Facility is located, or (ii) a partnership, professional service corporation or association duly organized and validly existing under the laws of the State in which the Facility is located, and authorized to practice medicine through its designated Contractor's Representatives.[64]

---

[59] (*See* Am. Compl. ¶ 116, Doc. No. 45; Opp'n to Hospital MSJ 9–12, Doc. No 140.)

[60] (*See* Opp'n to Hospital MSJ 12, Doc. No. 140.)

[61] (Ex. 6 to Hospital MSJ, PSA § 5.D, Doc. No. 123-1 (sealed).)

[62] (Hospital MSJ 22–24, Doc. No. 120.)

[63] (Ex. 6 to Hospital MSJ, PSA 1, Doc. No. 123-1 (sealed).)

[64] (*Id.*)

"Contractor's Representatives" is defined as "all of Contractor's employees, shareholders, partners and agents providing services under this Agreement."[65]

Relying on these definitions, Dr. Garvey contends the PSA is a contract between the Hospital, Ogden Clinic, and Ogden Clinic's physicians, employees, shareholders, partners, and agents providing services pursuant to the agreement.[66]  Dr. Garvey also contends she is a "Contractor" under PSA based on how this term is used elsewhere in the agreement.[67]  She points to the provision stating "Contractor agrees to provide[] professional *medical care* to Facility's Emergency Department patients on an on-call basis as scheduled ('Services') in the specialty of Trauma."[68]  According to Dr. Garvey, this must refer to physicians because only licensed physicians may practice medicine under Utah law.[69]  Likewise, she asserts the term "Contractor," as used in the following provisions of the PSA, can only be interpreted to refer to physicians:

- "Contractor will be a member in good standing of Facility's Medical Staff."[70]

---

[65] (*Id.*)

[66] (Opp'n to Hospital MSJ 9, Doc. No. 140.)

[67] (*Id.* at 9–10.)

[68] (Ex. 6 to Hospital MSJ, PSA 1, Doc. No. 123-1 (sealed) (emphasis added).)

[69] (Opp'n to Hospital MSJ 9–10, Doc. No. 140 (citing Utah Code. § 16-11-9).)

[70] (Ex. 6 to Hospital MSJ, PSA § 1.B, Doc. No. 123-1 (sealed).)

- "Contractor agrees to apply or reapply for medical staff privileges at Facility through Facility's Credentialing Online website where available."[71]

The Hospital acknowledged at the hearing that, perhaps, the PSA was inartfully drafted. As the Hospital explained, it used the same template for contracts with individual physicians and with professional service corporations (like Ogden Clinic). Indeed, the Hospital previously contracted directly with Dr. Garvey for trauma call services.[72] (The Hospital provided a copy of a prior professional services agreement signed by Dr. Garvey directly, which specifically named Dr. Garvey as a party.)[73] But the Hospital contends Dr. Garvey was not a party to the operative PSA, which specifically named only the Hospital and Ogden Clinic as parties.[74]

The plain language of the PSA shows Dr. Garvey is not a party to the agreement. Explicitly, the PSA is an agreement between the Hospital and Ogden Clinic, and it is signed by each entity's CEO.[75] It does not name Dr. Garvey as a party, nor is it signed by her. Dr. Garvey presents no evidence she, specifically, assented to the PSA. As Dr. Garvey correctly notes, it is apparent some portions of the PSA use the term "Contractor" to refer to physicians. But the PSA's inartful use of the term "Contractor" in

---

[71] (*Id.* § 1.C.)

[72] (*See* Hospital MSJ, SUF ¶ 14, Doc. No. 120.)

[73] (Ex. 7 to Hospital MSJ, 2001 PSA, Doc. No. 121-7.)

[74] (Hospital MSJ 22–23, Doc. No. 120.)

[75] (Ex. 6 to Hospital MSJ, PSA 1, 5–6, Doc. No. 123-1 (sealed).)

a few places does not render Dr. Garvey a party, where she is not named as a party and did not execute the agreement.

Dr. Garvey also cannot show she is a third-party beneficiary of the PSA. "Third-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration."[76] "The existence of third party beneficiary status is determined by examining a written contract."[77] "The written contract must show that the contracting parties clearly intended to confer a separate and distinct benefit upon the third party."[78] "[I]t is not enough that the parties to the contract know, expect or even intend that others will benefit."[79] Instead, "[t]he contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear."[80]

Nothing in the PSA indicates it is intended to confer a separate and distinct benefit upon Dr. Garvey. Dr. Garvey reiterates her argument that she falls within the definition of "Contractor" under the PSA, and she asserts this shows the contracting

---

[76] *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 506 (Utah 1980) (internal quotation marks omitted).

[77] *Wagner v. Clifton*, 2002 UT 109, ¶ 11, 62 P.3d 440 (internal quotation marks omitted).

[78] *Id.* (internal quotation marks omitted).

[79] *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 50, 28 P.3d 669 (citation omitted).

[80] *Id.* (citation omitted).

parties intended to confer a benefit on the class she belongs to.[81]  As mentioned,
certain provisions in the PSA use the term "Contractor" to refer to physicians
(specifically, the provisions requiring "Contractor[s]" to apply for privileges and remain in
good standing at the Hospital).[82]  But Dr. Garvey fails to identify any contractual
language evidencing an intent to confer a direct benefit on her (or Ogden Clinic
physicians as a class), *separate and distinct* from the benefits to Ogden Clinic.
Because she is not a party to or third-party beneficiary of the PSA, Dr. Garvey lacks
standing to bring a claim for breach of contract based on the PSA.

    Dr. Garvey also argues the relationship between her, Ogden Clinic, and the
Hospital created a "contract implied in fact," even if she was not a party to or third-party
beneficiary of the PSA.[83]  Under Utah law, a contract implied in fact exists if "(1) the
defendant requested the plaintiff to perform work; (2) the plaintiff expected the
defendant to compensate him or her for those services; and (3) the defendant knew or
should have known that the plaintiff expected compensation."[84]  But here, there is no
evidence the Hospital requested Dr. Garvey, specifically, perform work; rather, it
contracted with Ogden Clinic to provide trauma call services.  Likewise, there is no
evidence Dr. Garvey expected the Hospital to compensate her directly, rather than

---

[81] (Opp'n to Hospital MSJ 11–12, Doc. No. 140 (citing *Blyth-Farco Co. v. Free*, 148 P.
427 (Utah 1915)).)

[82] (Ex. 6 to Hospital MSJ, PSA §§ 1.B, 1.C, Doc. No. 123-1 (sealed).)

[83] (Opp'n to Hospital MSJ 10–11, Doc. No. 140.)

[84] *Davies v. Olson*, 746 P.2d 264, 269 (Utah Ct. App. 1987).

paying Ogden Clinic as set forth in the PSA.  Dr. Garvey's contract-implied-in-fact theory fails.

      ii.  Hospital Policies

Next, Dr. Garvey claims the Hospital "covenanted with [her] to adhere to its policies and procedures outlined in its Credentials Policy, Medical Staff Professionalism Policy[,] and Professional Practice Evaluation Policy."[85]  Dr. Garvey alleges the Hospital breached these policies by failing to: "provide collegial intervention and/or professional practice evaluations to [her] as preventative measures against more serious measures of discipline"; provide her "with 'Preliminary Notification' regarding concerns raised about her conduct and/or behavior"; "conduct adequate 'fact-finding' to determine if a report of [her] disruptive behavior was credible"; and "obtain input from [her] and allow her to provide a written explanation of her perspective on the incident."[86]

The Hospital argues Dr. Garvey fails to establish any specific breach of Hospital policy and cannot show damages resulting from any alleged breach.[87]  As explained below, Dr. Garvey fails to identify evidence in the record supporting her allegations regarding breach of Hospital policies.

First, Dr. Garvey argues the Credentialing Policy, the Medical Staff Professionalism Policy ("MSPP"), and the Professional Practice Evaluation Policy

---

[85] (Am. Compl. ¶ 119, Doc. No. 45.)

[86] (*Id.* ¶ 121.)

[87] (Hospital MSJ 27–28, Doc. No. 120.)  The Hospital does not address whether the policies constituted a contract between the Hospital and Dr. Garvey.

("PPEP") all "outline progressive steps, beginning with collegial and education efforts, to help address purported conduct from physicians that [does] not meet expected standards."[88]  But she fails to support her argument with citation to any specific provision in these policies.  She then asserts the PIP implemented by the Hospital was a "more drastic intervention method."[89]  But again, she fails to support this contention with citation to record evidence; she does not explain how the PIP violated any specific provision in the Hospital's policies.  Moreover, the Hospital notes that both the Credentialing Policy and the MSPP specifically state that progressive steps and collegial and education efforts are discretionary, not mandatory.[90]

Next, Dr. Garvey asserts the MSPP "outlines the disciplinary process that must be followed," including "providing notice to a Practitioner when a concern has been raised and inviting the Practitioner to provide input"—but again she fails to cite any

---

[88] (Opp'n to Hospital MSJ 14, Doc. No. 140.)

[89] (*Id.*)

[90] (*See* Def. Ogden Reg'l Med. Ctr.'s Reply in Supp. of Mot. for Summ. J. ("Hospital Reply") 12, Doc. No. 144; Ex. 3 to Hospital MSJ, Credentials Policy 38, Doc. No. 121-3 ("Collegial efforts and progressive steps *may* be carried out, *within the discretion* of Medical Staff Leaders and Hospital Administration, *but are not mandatory*" (emphasis added)); Ex. 10 to Hospital MSJ, MSPP § 1.A(1), Doc. No. 121-10 ("This Policy . . . outlines progressive steps, beginning with collegial and educational efforts, which *can* be used by Medical Staff and Hospital Leaders to address conduct that does not meet expected standards." (emphasis added)); *id.* § 3.A ("[N]othing in this Policy precludes an immediate referral of a matter being addressed through this Policy to the Medical Executive Committee *or the elimination of any particular step* in the Policy." (emphasis added)).)

specific provision of the MSPP in support.[91]  She asserts she "was never provided preliminary notice that a complaint of inappropriate conduct had been reported and was never given an opportunity to provide input, as required under the MSPP."[92]  But she cites no record evidence in support of these assertions.  On the other hand, the Hospital's statement of undisputed facts describes (and cites record evidence of) several meetings between medical staff and Dr. Garvey to discuss complaints against her, including before the PIP was implemented.[93]  In her opposition brief, Dr. Garvey does not dispute these factual assertions or offer any evidence to the contrary.  Nor does she explain how the Hospital's handling of the complaints violated any specific provision of the MSPP.

Next, Dr. Garvey contends the PPEP "outlines the method by which a practitioner should be given an opportunity to provide meaningful input."[94]  She cites the section of the policy governing "notice and input from the practitioner," and references specific requirements.[95]  But as the Hospital notes, the PPEP's procedures apply "when questions or concerns are raised about a Practitioner's *clinical competence*."[96]  The

---

[91] (Opp'n to Hospital MSJ 14, Doc. No. 140.)

[92] (*Id.*)

[93] (Hospital MSJ, SUF ¶¶ 42, 50–51, 55, Doc. No. 120.)

[94] (Opp'n to Hospital MSJ 14, Doc. No. 140.)

[95] (*See id.*; Ex. 3 to Opp'n to Hospital MSJ, PPEP § 3, Doc. No. 138 at 95–125.)

[96] (Ex. 3 to Opp'n to Hospital MSJ, PPEP § 1.B(1)(a), Doc. No. 138 at 95–125 (emphasis added).)

Hospital asserts the complaints regarding Dr. Garvey (and resulting PIP) related to her behavior and professionalism, not her clinical competence.[97]  And Dr. Garvey offers no evidence of any complaint or concern relating to her clinic competence.  Accordingly, Dr. Garvey has not demonstrated the PPEP's relevance to the complaints at issue.

Finally, Dr. Garvey contends the Hospital "failed to provide an opportunity for [her] to provide input prior to the completion of its review and final determination to remove her from the on-call schedule."[98]  But she fails to identify any contractual right to participate in the trauma call rotation under the Credentials Policy, MSPP, or PPEP.  The policies she references apply, on their face, to credentialing at the Hospital, and Dr. Garvey's privileges at the Hospital were not terminated.  In other words, she fails to identify any policy requiring the Hospital to provide her with an opportunity for "input" before barring her from participating in the trauma call rotation.

For all these reasons, Dr. Garvey fails to present evidence sufficient for a reasonable jury to find the Hospital breached its policies.  Because Dr. Garvey lacks standing to enforce the PSA, and she fails to present sufficient evidence of a breach of Hospital policies, the Hospital is entitled to judgment as a matter of law on Dr. Garvey's breach of contract claim.

---

[97] (*See* Hospital Reply 12, Doc. No. 144.)

[98] (Opp'n to Hospital MSJ 14–15, Doc. No. 140.)

B.  Implied Covenant of Good Faith and Fair Dealing

Under Utah law, "[a]n implied covenant of good faith and fair dealing inheres in every contract," and a "violation of the covenant is a breach of contract."[99]  "To comply with their implied duties under this covenant, contracting parties must act consistent with the contract's purpose and the other party's expectations, and may not intentionally injure each other's right to receive the benefit of the bargain."[100]  "Utah courts look to a contract's terms and the parties' course of dealing to understand the parties' intent, but will not imply duties from a party's expectations when such expectations lack a basis in a contract's plain and unmistakable language."[101]

1.  *Implied Covenant Claim Against Ogden Clinic*

Dr. Garvey claims Ogden Clinic breached the implied covenant of good faith and fair dealing in three ways: (1) by "wrongfully terminating [her] employment for reasons unsupported by fact and without performing any investigation into the validity of the accusations asserted against [her] by the Hospital"; (2) "by allowing the Hospital to assert control over Ogden Clinic's business practices and methods of providing services to the Hospital under the [PSA] contrary to the agreement's terms"; and (3) by "failing to investigate and defend Dr. Garvey[] from her termination in the Hospital's trauma call

---

[99] *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193.

[100] *Behav. Med. Consulting, LLC v. CHG Co., Inc.*, No. 23-4047, 2024 U.S. App. LEXIS 23799, at *11–12 (10th Cir. Sept. 19, 2024) (unpublished) (citing *Eggett*, 2004 UT 28, ¶ 14; *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991)).

[101] *Id.* at *12 (citing *St. Benedict's*, 811 P.2d at 198).

rotation such that she could receive the benefit of the [PSA] between Ogden Clinic and the Hospital."[102]

Ogden Clinic contends portions of this claim duplicate Dr. Garvey's breach of contract claim—specifically, her assertion that Ogden Clinic terminated her for reasons unsupported by fact and prevented her from receiving the benefit of the PSA.[103]  Ogden Clinic also argues Dr. Garvey seeks to impose obligations on Ogden Clinic to which it did not agree and which are inconsistent with the express terms of the employment agreement and PSA.[104]  Ogden Clinic maintains it had no express or implied obligation to investigate the validity of the Hospital's reasons for barring Dr. Garvey from the trauma call rotation, or to defend her against the Hospital's decision.[105]  Finally, Ogden Clinic argues the Hospital had a "contractual right to disqualify a trauma surgeon from taking call in the Hospital, and it exercised that right to disqualify [Dr. Garvey]."[106]

Dr. Garvey argues Ogden Clinic had an implied obligation under the employment agreement to abide by its employee handbook, which provided for the investigation of all reported incidents of prohibited conduct.[107]  She notes her termination letter accused

---

[102] (Am. Compl. ¶ 128, Doc. No. 45.)

[103] (Ogden Clinic MSJ 9–11, Doc. No. 116.)

[104] (*Id.* at 11.)

[105] (*Id.* at 11–12.)

[106] (*Id.* at 12.)

[107] (Opp'n to Ogden Clinic MSJ 16, Doc. No. 132; Ex. 9 to Opp'n to Ogden Clinic MSJ, Employee Handbook 39, Doc. No. 135 at 93–154.)

her of "using obscene, abusive, or threatening language or gestures, or similar disorderly conduct on company premises or during work hours" (language from the employee handbook)—but Ogden Clinic did not investigate the reports lodged against her.[108]  Dr. Garvey contends she had a "reasonable expectation that she could not be terminated for cause absent conduct that was actually improper."[109]  And she asserts she had a reasonable expectation that Ogden Clinic "would defend both Dr. Garvey and Ogden Clinic's right under the [PSA] to provide services, including Trauma Call Services without the Hospital exercising any 'control or direction.'"[110]

As an initial matter, Ogden Clinic is correct that portions of Dr. Garvey's implied covenant claim are duplicative of her breach of contract claim.  Specifically, her assertion that Ogden Clinic breached the implied covenant of good faith and fair dealing by wrongfully terminating her without a factual basis merely restates her claim that Ogden Clinic terminated her without valid cause.  Because the contract's express terms govern termination for cause, Dr. Garvey cannot bring a claim for breach of the implied covenant on this basis.  Likewise, Dr. Garvey cannot prevail on a claim that Ogden Clinic breached covenants implied in the PSA, where she was neither a party to nor a third-party beneficiary of the PSA.  Accordingly, any implied covenant must arise from the employment agreement, not the PSA.

---

[108] (Opp'n to Ogden Clinic MSJ 16, Doc. No. 132; Ex. F to Ogden Clinic MSJ, Termination Letter, Doc. No. 117-9.)

[109] (Opp'n to Ogden Clinic MSJ 18, Doc. No. 132.)

[110] (*Id.* (quoting Ex. 6 to Hospital MSJ, PSA § 5.D, Doc. No. 123-1 (sealed)).)

Viewing the facts in the light most favorable to Dr. Garvey, the evidence could support a finding that Dr. Garvey had a reasonable expectation that Ogden Clinic would investigate before terminating her "for cause" based on misconduct.  This expectation is consistent with the "for cause" provisions of the agreement and the procedures outlined in the employee handbook.[111]  But Ogden Clinic had valid cause to terminate Dr. Garvey for a reason *other* than misconduct—namely, her inability to meet "call schedule requirements" after the Hospital barred her from the trauma call rotation.  And nothing in the language of the employment agreement suggests Ogden Clinic had an obligation to investigate *the Hospital's* reasons for this decision.  Likewise, nothing in the language of the employment agreement suggests Ogden Clinic had an obligation to contest the Hospital's decision on Dr. Garvey's behalf.

Dr. Garvey also cannot prevail on this claim based on her theory that Ogden Clinic failed to enforce the terms of the PSA with the Hospital.  Even assuming an implied covenant to enforce the PSA could be inferred from her employment agreement, Dr. Garvey fails to show any breach.  Dr. Garvey points to the PSA's provision stating the Hospital "will neither have nor exercise any control or direction over . . . the methods by which Contractor performs Services."[112]  She argues Ogden Clinic improperly

---

[111] (*See* Ex. A to Ogden Clinic MSJ, Employment Agreement § 7.2(e), Doc. No. 117-1 (defining "cause" to include "improper conduct in dealing with a fellow employee, patient or any third person with whom Employee has contact through employment with Employer"); Ex. 9 to Opp'n to Ogden Clinic MSJ, Employee Handbook 39, Doc. No. 135 at 93–154 (providing that all reported incidents of prohibited conduct would be investigated).)

[112] (Ex. 6 to Hospital MSJ, PSA § 5.D, Doc. No. 123-1 (sealed).)

allowed the Hospital to assert control over Ogden Clinic's methods of providing services

when the Hospital barred Dr. Garvey from participating in the trauma call rotation.[113]

But as Ogden Clinic points out, the context of this provision makes clear it refers only to

the practice of medicine.  The full paragraph states:

> D. <u>Practice of Medicine</u>.  Facility is neither authorized nor qualified to
> engage in any activity that may be construed or deemed to constitute the
> practice of medicine.  *Facility will neither have nor exercise any control or
> direction over Contractor's medical judgment or the methods by which
> Contractor performs Services.*  To the extent that any act or service required
> of, or reserved to, Facility in this Agreement is construed or deemed to
> constitute the practice of medicine, the performance of such act or service
> by Facility will be deemed waived or unenforceable.[114]

Read in context, this provision applies to interference with medical judgment and

methods of practicing medicine—not decisions regarding which physicians may

participate in trauma call rotation.

Furthermore, the PSA requires Ogden Clinic to "provide Emergency Department

call coverage in accordance with Facility's Bylaws, Rules and Regulations and Policies

and Procedures and *in accordance with the call schedule maintained by the Facility*."[115]

This language expressly permits the Hospital to exercise some control over the call

schedule.  Dr. Garvey responds that the Hospital "played no role in setting or organizing

the call schedule," citing her own testimony.[116]  But Dr. Garvey's testimony regarding

---

[113] (Opp'n to Ogden Clinic MSJ 18, Doc. No. 132.)

[114] (Ex. 6 to Hospital MSJ, PSA § 5.D, Doc. No. 123-1 (sealed) (emphasis added).)

[115] (*Id.* § 1.A.)

[116] (Opp'n to Ogden Clinic MSJ, RSUF ¶ 7, Doc. No. 132 (citing Ex. 1 to Opp'n to
Ogden Clinic MSJ, Garvey Dep. 103:6–108:16, Doc. No. 135 at 4–57).)

the parties' general practices cannot overcome the express terms of the PSA.  In any
event, no language in the PSA expressly prohibits the Hospital from barring a particular
physician from participating in the trauma call rotation, as Dr. Garvey claims.  Because
the Hospital's decision to bar Dr. Garvey from the rotation did not violate the PSA, Dr.
Garvey cannot show Ogden Clinic failed to enforce the PSA.

For these reasons, Ogden Clinic is entitled to judgment as a matter of law on Dr.
Garvey's claim for breach of the implied covenant of good faith and fair dealing.

### 2. *Implied Covenant Claim Against the Hospital*

In her amended complaint, Dr. Garvey claims the Hospital breached the implied
covenant of good faith and fair dealing by "intentionally breaching the various
agreements and arrangement including the Credentialing Policy," "failing to adhere to its
own policies relating to Professional Improvement Plans and Credentialing," "defaming
and slandering Dr. Garvey's long-standing reputation," "removing her from its Trauma
Center's on-call rotation," and "asserting control over Ogden Clinic."[117]  But in her
summary judgment briefing, Dr. Garvey focuses on the PSA—arguing she had a
"justified expectation that [the Hospital] would not interfere with her right to receive the
benefits of the PSA unless she became ineligible or disqualified to provide such
services."[118]

---

[117] (Am. Compl. ¶ 129, Doc. No. 45.)

[118] (Opp'n to Hospital MSJ 16, Doc. No. 140.)

Dr. Garvey's assertions that the Hospital "intentionally breach[ed]" and "failed to adhere to" its own policies go to breach of contract, not breach of an implied covenant.[119]  With respect to defamation, Dr. Garvey fails to present sufficient evidence of any defamatory statement made by the Hospital, as explained in section C.2.  And Dr. Garvey cannot claim an implied covenant arising from the PSA, where she is not a party to or third-party beneficiary of that agreement.

Accordingly, the Hospital is entitled to judgment as a matter of law on Dr. Garvey's claim for breach of the implied covenant of good faith and fair dealing.

C.  Defamation

To establish a claim for defamation[120] under Utah law, Dr. Garvey must demonstrate "(1) the defendant published the statements [in print or orally]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements

---

[119] As noted above, the Hospital does not argue these policies were not contracts between Dr. Garvey and the Hospital.  But even if the policies were not express contracts, Dr. Garvey has failed to demonstrate any failure to adhere to them, for the reasons explained in section A.2.ii above.

[120] Dr. Garvey's fifth cause of action is "Libel and Defamation."  (Am. Compl. p. 26, Doc. No. 45.)  The term "defamation" encompasses both libel (defamation expressed in writing or pictures) and slander (defamation by spoken words).  *See West v. Thomson Newspapers*, 872 P.2d 999, 1007 n.12 (Utah 1994).  Therefore, the analysis of defamation applies to Dr. Garvey's libel claims.

resulted in damages."[121]  Where Dr. Garvey is not a public figure, the requisite degree
of fault is negligence.[122]

"[A] statement is defamatory if it impeaches an individual's honesty, integrity,
virtue, or reputation and thereby exposes the individual to public hatred, contempt, or
ridicule."[123]  "[I]n determining whether a particular statement fits within the rather broad
definition of what may be considered defamatory, the guiding principle is the
statement's tendency to injure a reputation in the eyes of its audience."[124]  While the
factfinder ultimately evaluates whether a statement actually defamed a plaintiff,
"[w]hether a statement is capable of sustaining a defamatory meaning is a question of
law."[125]  "[P]ure statements of opinion which cannot, by definition, be proven false"
cannot constitute defamation because defamation requires falsity.[126]

In her amended complaint, Dr. Garvey alleges the Hospital and Ogden Clinic
published statements to each other, to Davis Hospital and Medical Center, and to other
medical providers "indicating, in part, that Dr. Garvey was a disruptive practitioner

---

[121]  *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 68, 194 P.3d 956 (alteration in original)
(citation omitted).

[122]  *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 32 n.13, 116 P.3d 271.

[123]  *Jacob v. Bezzant*, 2009 UT 37, ¶ 26, 212 P.3d 535 (quoting *West*, 872 P.2d at
1008).

[124]  *West*, 872 P.2d at 1008.

[125]  *Id.*

[126]  *Davidson v. Baird*, 2019 UT App 8, ¶¶ 25, 31, 438 P.3d 928.

and/or other remarks that were disparaging of Dr. Garvey's professional reputation."[127] Dr. Garvey claims these statements were false and defamatory, and the defendants knew they would "negatively impact [her] profession."[128]  Specifically, she alleges that in 2020, "an employee of Davis Hospital and Medical Center, where Dr. Garvey held privileges, told Dr. Garvey that they had received 'some additional information' from the Hospital (or alternatively from Ogden Clinic) and that, as a result, Davis Hospital would be terminating her privileges."[129]  She also alleges the Hospital "attempted to sabotage [her] ability to renew her privileges at McKay-Dee Hospital" by "provid[ing] a letter regarding [her] so-called 'disruptive' behavior to that hospital."[130]  She states that when she tried to obtain privileges at other hospitals after her termination, she had to authorize those hospitals to obtain information from the Hospital and Ogden Clinic—but after doing so, those hospitals informed her they were unwilling to grant her privileges.[131]

### 1. Defamation Claim Against Ogden Clinic

Ogden Clinic argues Dr. Garvey's defamation claim fails for myriad reasons. First, the clinic asserts Dr. Garvey has "no evidence it provided any negative or critical

---

[127] (Am. Compl. ¶¶ 147–48, Doc. No. 45.)

[128] (*Id.* ¶¶ 149–50, 152.)

[129] (*Id.* ¶ 57.)

[130] (*Id.* ¶ 58.)

[131] (*Id.* ¶¶ 103–06.)

information to her prospective employers."[132]  Second, Ogden Clinic contends Dr.

Garvey expressly authorized it to provide information to prospective employers and

released it from liability for doing so.[133]  Specifically, Ogden Clinic points to release

forms Dr. Garvey signed in connection with requests for information by CHG

Healthcare/CompHealth ("CHG") and St. Joseph Regional Medical Center.[134]  (Ogden

Clinic denies receiving a request for information from Davis Hospital, and asserts there

is "no evidence" it made any statements to Davis Hospital about Dr. Garvey as alleged

in her amended complaint.)[135]  Third, Ogden Clinic contends its statements to

prospective employers are privileged.[136]  Finally, Ogden Clinic argues any statement

that Dr. Garvey was a "disruptive practitioner" is an unactionable opinion.[137]

      In response, Dr. Garvey argues there is sufficient evidence for a factfinder to

conclude Ogden Clinic made defamatory statements to prospective employers.[138]  She

cites (1) her prior statement (in administrative proceedings before the Utah

Antidiscrimination and Labor Division) that she received seven job offers after her

---

[132] (Ogden Clinic MSJ 14, Doc. No. 116.)

[133] (*Id.* at 14–15.)

[134] (*See id.*; Ex. H to Ogden Clinic MSJ, CHG Healthcare Employment Verification Form ("CHG Form"), Doc. No. 117-11; Ex. I to Ogden Clinic MSJ, St. Joseph Regional Medical Center Letter ("St. Joseph Letter"), Doc. No. 117-12.)

[135] (Ogden Clinic MSJ 14, Doc. No. 116.)

[136] (*Id.* at 15–16.)

[137] (*Id.* at 16.)

[138] (Opp'n to Ogden Clinic MSJ 22–23, Doc. No. 132.)

termination from Ogden Clinic, but each offer was withdrawn during the credentialing

process,[139] and (2) her deposition testimony that "when [she] tried to credential,

information is being provided from somewhere that gets [her] offers withdrawn."[140]

While acknowledging she authorized Ogden Clinic to provide information about her

employment to prospective employers, Dr. Garvey argues she "did not authorize Ogden

Clinic to provide inaccurate and disparaging information that lacked a factual basis."[141]

She also asserts the releases are "conditional" and do not protect Ogden Clinic if

defamatory statements are made with malice or reckless disregard for the truth.[142]

Dr. Garvey's defamation claim fails because she has not identified evidence of

any specific defamatory statement Ogden Clinic made.  Starting with the requests for

information from CHG and St. Joseph, Dr. Garvey fails to identify any defamatory

statement in Ogden Clinic's written responses to those requests.  Ogden Clinic provided

Dr. Garvey's dates of employment and checked boxes on both forms indicating she was

eligible for rehire.[143]  On the CHG form, Ogden Clinic also checked boxes indicating Dr.

Garvey was not under any restrictions and there was no "derogatory information" or

---

[139] (Ex. 7 to Opp'n to Ogden Clinic MSJ, Unemployment Appeal Hearing, Doc. No. 137-1 at 19 (sealed).)

[140] (Ex. 1 to Opp'n to Ogden Clinic MSJ, Garvey Dep. 140:2–4, Doc. No. 135 at 4–57.)

[141] (Opp'n to Ogden Clinic MSJ 18, Doc. No. 132.)

[142] (*Id.* at 23.)

[143] (Ex. H to Ogden Clinic MSJ, CHG Form, Doc. No. 117-11; Ex. I to Ogden Clinic MSJ, St. Joseph Letter, Doc. No. 117-12.)

disciplinary action.[144]  Dr. Garvey does not argue any particular statement on these forms was false or defamatory.  Indeed, none of the information Ogden Clinic provided appears negative in any way.

Dr. Garvey provides no other evidence of specific statements made by Ogden Clinic to prospective employers.[145]  Although Dr. Garvey's testimony that offers were withdrawn during the credentialing process could support an inference that *someone* provided negative information about her, she fails to identify evidence showing Ogden Clinic was the source of that information—or evidence of any specific defamatory statement.  Her testimony that "information [was] being provided from somewhere" is insufficient to support a finding that *Ogden Clinic*, specifically, made statements to her prospective employers (aside from the forms discussed above)—let alone defamatory statements.  She also fails to identify any evidence to support the allegation in her amended complaint that Ogden Clinic made statements indicating she was a "disruptive practitioner."[146]  Accordingly, she has not established a triable dispute of fact as to her defamation claim against Ogden Clinic.[147]

---

[144] (Ex. H to Ogden Clinic MSJ, CHG Form, Doc. No. 117-11.)

[145] In the amended complaint, Dr. Garvey also alleges Ogden Clinic made defamatory statements to the Hospital and to Davis Medical Hospital and Medical Center, but she appears to have abandoned this theory.  She offers no argument or evidence in her summary judgment briefing to suggest Ogden Clinic made defamatory statements to these entities.

[146] (Am. Compl. ¶ 148, Doc. No. 45.)

[147] *See Oman*, 2008 UT 70, ¶ 69 (affirming entry of summary judgment against the plaintiff on a defamation claim where the plaintiff "made generalized allegations that

Because Dr. Garvey fails to identify evidence of any defamatory statement made by Ogden Clinic, Ogden Clinic's arguments regarding the release forms, privilege, and statements of opinion need not be addressed.  Ogden Clinic is entitled to summary judgment on Dr. Garvey's defamation and libel claim.

### 2.  Defamation Claim Against the Hospital

The Hospital argues Dr. Garvey's defamation claim fails as a matter of law because she expressly authorized it to release information to third parties.[148] Specifically, the Hospital relies on (1) a release Dr. Garvey signed during her credentialing reappointment process in December 2019; (2) a "forever letter" she negotiated following the PIP; and (3) releases she signed in connection with requests for information from particular hospitals.[149]  The Hospital also argues any defamation claim based on the alleged statements to McKay-Dee Hospital and Davis Hospital is time-barred by Utah's one-year statute of limitations.[150]

In response, Dr. Garvey argues she "did not authorize [the Hospital] to provide inaccurate and disparaging information that lacked a factual basis."[151]  According to Dr. Garvey, the Hospital released information on a cloud database known as IPrivilege,

---

defamatory statements were made in certain instances and in certain documents," but "failed to identify the specific statements made during the instances or contained in the documents that were defamatory").

[148] (Hospital MSJ 32, Doc. No. 120.)

[149] (See id. at 32–35.)

[150] (Id. at 35–36.)

[151] (Opp'n to Hospital MSJ 17, Doc. No. 140.)

instructing other medical facilities to "contact MSO" (the Hospital's medical staff office) before credentialing her.[152]  Dr. Garvey argues a reasonable factfinder could conclude the Hospital then "provided information in the form of a 'forever letter' that exceeded the scope of the authorizations and immunity extended by [her]."[153]  Dr. Garvey also testified two hospitals offered her employment pending credentialing but withdrew the offers after receiving "information" from the Hospital.[154]  She suggests that because she continued to be credentialed at the Hospital, a reasonable inference may be drawn that the information the Hospital provided was disparaging and defamatory—since it disqualified credentialing at other facilities but not at the Hospital.[155]  Finally, Dr. Garvey argues the statute of limitations should be equitably tolled based on the "discovery rule" because (according to Dr. Garvey) the Hospital refused to produce communications with Davis Hospital and McKay-Dee Hospital during discovery.[156]

In reply, the Hospital disputes it withheld any communications with other hospitals.[157]  While it asserted peer review privilege early in the litigation, the Hospital ultimately decided to waive the privilege and produce Dr. Garvey's entire credentialing

---

[152] (*Id.* at 18.)

[153] (*Id.*)

[154] (Ex. 6 to Opp'n to Hospital MSJ, Garvey Dep. 25:18–26:12, Doc. No. 138 at 131–84.)

[155] (Opp'n to Hospital MSJ 18–19, Doc. No. 140.)

[156] (*Id.* at 20–21.)

[157] (Hospital Reply 15, Doc. No. 144.)

file, including all communications with other hospitals.[158]  Despite this, the Hospital

asserts, Dr. Garvey has identified no evidence of defamatory statements.[159]

As with Ogden Clinic, Dr. Garvey fails to identify evidence of any defamatory

statement published by the Hospital.  Dr. Garvey appears to rely on three

communications by the Hospital: (1) the instruction on the IPrivilege system to "contact

MSO," (2) the "forever letter," and (3) unspecified "information" provided by the Hospital

to the two hospitals which withdrew employment offers.  As explained below, Dr. Garvey

fails to identify any defamatory statement in these communications.

First, Dr. Garvey has not shown the instruction on the IPrivilege system directing

other hospitals to "contact" the Hospital's medical staff office is capable of defamatory

meaning.  Rather, the evidence cited by Dr. Garvey demonstrates it was merely an

invitation to obtain further information.  Dr. Garvey cites the testimony of Dr. Filip Roos,

who explained "IPrivilege is a database that hospitals query in terms of affiliation

confirmation."[160]  Dr. Roos explained that in certain circumstances, a physician's status

in the IPrivilege system could be changed from "good standing" to "contact MSO."[161]

When contacted, the Hospital would first ask the requesting hospital to obtain a release

from Dr. Garvey; if she signed a release, the Hospital would provide further information

---

[158] (*Id.*)

[159] (*Id.* at 14–16.)

[160] (Ex. 7 to Opp'n to Hospital MSJ, Dep. of Filip Roos, M.D. ("Roos Dep.") 239:1–4, Doc. No. 138 at 185–358.)

[161] (*Id.* at 239:23–240:7.)

such as the "forever letter" regarding her PIP.[162]  Dr. Roos testified he did not know

what specific information was provided to requesting hospitals regarding Dr. Garvey, but

it was "most likely that forever letter."[163]

Next, Dr. Garvey fails to demonstrate the "forever letter" itself is defamatory, or

that it exceeded the scope of the releases she signed.  The letter states: "Dr. Sheila

Garvey has been involved in a Performance Improvement Plan (PIP) since January 3rd,

2020 and there have been no additional issues.  We anticipate successful completion of

this PIP."[164]  As an initial matter, Dr. Garvey does not argue any statement in the letter

is false.  Further, the Hospital presented evidence Dr. Garvey negotiated the wording of

the letter and expressly authorized the Hospital to release it to other entities[165]—and Dr.

Garvey provides no contrary evidence.  For example, Dr. Garvey signed a release in

connection with a request from Intermountain Healthcare which states:

> This is to authorize Ogden Regional Medical Center . . . to provide
> Intermountain Healthcare . . . with any and all information and
> documentation, written or oral, relevant to the Requesting Entity's request
> for information regarding my professional qualifications.

> This Authorization specifically includes, the release of information agreed
> upon on 10/26/2020 [the date of the forever letter].

---

[162] (*Id.* at 240:8–241:12.)

[163] (*Id.* at 242:4–20.)

[164] (Ex. 16 to Hospital MSJ, Letter to Intermountain Healthcare (Oct. 26, 2020), Doc. No. 123-7 (sealed).)

[165] (*See* Ex. 1 to Hospital MSJ, Roos Dep. 295:9–19, Doc. No. 121-1 ("She participated heavily, and she hard negotiated to dilute that verbiage as much as possible."); Ex. 13 to Hospital MSJ, Intermountain Healthcare Release, Doc. No. 123-4 at 4.)

> I hereby extend immunity to the fullest extent permitted by law, release from any and all liability, and agree not to sue, the [Hospital] for: (1) providing the above information and documentation to the Requesting Entity, and (2) any action that may be taken by the Requesting Entity resulting from the provision of that information and documentation.[166]

She signed an identical release in connection with a request from Castleview Hospital.[167]  Dr. Garvey does not dispute she signed these releases, and she does not explain how the forever letter could be construed as exceeding the scope of the releases, where the releases specifically referenced it.  In sum, the uncontroverted evidence shows Dr. Garvey expressly authorized the Hospital to provide the forever letter to other entities and released it from liability for doing so.  Accordingly, the forever letter cannot support a defamation claim against the Hospital.

This leaves Dr. Garvey's assertion that the Hospital provided unspecified information to the two hospitals which withdrew employment offers.  Without more, this is insufficient to support a defamation claim.  Dr. Garvey simply fails to identify any specific statement (other than the forever letter) made by the Hospital to other hospitals.

Finally, Dr. Garvey fails to provide any evidence supporting her allegations that the Hospital made defamatory statements to McKay-Dee Hospital and Davis Hospital in 2020.  Indeed, she provides no evidence of any communications between the Hospital and these entities.  Dr. Garvey's argument that the Hospital refused to produce its communications with these entities (which the Hospital disputes) is unavailing at this

---

[166] (Ex. 13 to Hospital MSJ, Intermountain Healthcare Release, Doc. No. 123-4 at 4 (sealed).)

[167] (Ex. 14 to Hospital MSJ, Castleview Release, Doc. No. 123-5 at 6 (sealed).)

stage.  If Dr. Garvey believed the Hospital was improperly withholding evidence during discovery, she could have moved to compel production.  Dr. Garvey did not do so, and discovery is now closed.  She also did not move to reopen discovery in response to the summary judgment motions, nor has she moved for sanctions based on the alleged withholding; rather, she chose to respond to the summary judgment motions on the merits.  At this stage, Dr. Garvey must cite materials in the record sufficient to raise a genuine dispute of material fact as to each element of her claims.[168]  She fails to do so for her defamation claim, where she identifies no evidence of any defamatory statement by the Hospital.

Because Dr. Garvey fails to present evidence of any defamatory statement by the Hospital, the Hospital is entitled to summary judgment on her defamation and libel claim.

### D. Tortious Interference with Business Relations

To prevail on a claim of tortious interference with business relations under Utah law, a plaintiff must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."[169]  "[N]o tortious interference claim can succeed without evidence of improper means."[170]  The Utah Supreme Court has defined improper

---

[168] *See* Fed. R. Civ. P. 56(c)(1); *McKnight*, 149 F.3d at 1128.

[169] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (alteration in original) (citation omitted).

[170] *Id.* ¶ 4.

means "narrowly to include only those actions that are contrary to law, such as violations of statutes, regulations, or recognized common-law rules, or actions that violate an established standard of a trade or profession."[171]   A "non-exhaustive list" of improper means includes "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]."[172]

Dr. Garvey claims Ogden Clinic and the Hospital engaged in tortious interference in two ways: (1) by providing "false, misleading, and/or disparaging information" to Davis Hospital (including that Dr. Garvey was a "disruptive practitioner"), causing Davis Hospital to terminate her privileges; and (2) by providing "false, misleading, and/or disparaging information" to other hospitals, interfering with her ability to obtain employment or other contractual relationships with those hospitals.[173]   Dr. Garvey also claims the Hospital tortiously interfered with her contractual relationship with Ogden Clinic when it notified the clinic the Hospital would terminate the PSA unless Dr. Garvey was removed from the trauma call rotation.[174]   For their part, Ogden Clinic and the

---

[171] *C.R. Eng. v. Swift Transp. Co.*, 2019 UT 8, ¶ 42, 437 P.3d 343 (internal quotation marks omitted).

[172] *Id.* (alteration in original) (citation omitted).

[173] (Am. Compl. ¶¶ 140–41, 143–44, Doc. No. 45.)

[174] (*Id.* ¶¶ 134–38.)

Hospital argue Dr. Garvey fails to properly allege or present evidence of improper means.[175]

Regardless of whether the claim is properly pleaded, Dr. Garvey's tortious interference claim fails for lack of evidence of improper means.  For her claim of tortious interference as to other hospitals, Dr. Garvey contends the improper means was defamation.[176]  But as explained above, Dr. Garvey fails to provide evidence of any defamatory statement by either defendant to any other hospital.  Where her defamation claim fails (for the reasons described above), and she relies on defamation as an essential element of her tortious interference claim, her tortious interference claim must also fail.

For her claim that the Hospital tortiously interfered with her relationship with Ogden Clinic, Dr. Garvey relies on breach of contract and breach of the implied covenant of good faith and fair dealing as the improper means.[177]  She argues her tortious interference claim is not precluded where those claims are "not precluded as a matter of law."[178]  But as explained above, Dr. Garvey fails to raise a triable issue of fact on her contract claims against the Hospital because she is not a party to the PSA and has not shown any breach of Hospital policy.  Where she relies on these claims as an

---

[175] (Ogden Clinic MSJ 16–17, Doc. No. 116; Hospital MSJ 37–38, Doc. No. 120.)

[176] (*See* Opp'n to Ogden Clinic MSJ 24, Doc. No. 132.)

[177] (*See* Opp'n to Hospital MSJ 21–22, Doc. No. 140.)

[178] (*Id.* at 22.)

element of her tortious interference claim, and her contract claims fail as a matter of law, her tortious interference claim is also precluded.

   E.  Discrimination Based on Sex and Age

   Title VII prohibits employers from discriminating on the basis of "race, color, religion, sex, or national origin."[179]  The ADEA prohibits employers from discriminating against individuals at least forty years old based on their age.[180]  Dr. Garvey claims she was terminated by Ogden Clinic and the Hospital based on her sex and age, in violation of these statutes.[181]

   1.  *Discrimination Claims Against the Hospital*

   The Hospital argues Dr. Garvey's discrimination claims against it fail at the outset because she was not an employee of the Hospital.[182]  Dr. Garvey contends a triable dispute of fact exists as to whether she was employee.[183]  As explained below, Dr. Garvey fails to provide sufficient evidence for a reasonable jury to conclude she was an employee of the Hospital.

---

[179] 42 U.S.C. § 2000e-2(a)(1).

[180] 29 U.S.C. §§ 623(a)(1), 631(a).

[181] (Am. Compl. ¶¶ 154–76, Doc. No. 45.)

[182] (Hospital MSJ 38–39, Doc. No. 120.)

[183] (Opp'n to Hospital MSJ 22–23, Doc. No. 140.)

i. Applicable Law

To make out a prima facie case of discrimination under Title VII or the ADEA, "a
plaintiff must first prove the defendant was her employer."[184]  Whether a plaintiff is an
employee for purposes of Title VII and the ADEA is a question of federal law.[185]
"Factfinders must decide whether a defendant is an employer for purposes of Title VII
when doubts exist as to (1) whether a plaintiff is an employee or an independent
contractor, or, alternatively, (2) which one(s) of multiple individuals or entities is (are) the
plaintiff's employer."[186]

The Tenth Circuit "chooses among three different tests to determine whether a
defendant is an employer depending on the situation: (i) the hybrid test; (ii) the joint
employer test; and (iii) the single employer test."[187]  First, the hybrid test is used to
distinguish an employee from an independent contractor.[188]  This test "combines two
types of analysis: (1) a common law inquiry asking whether an entity controls its
workers in an employer-employee relationship, and (2) the 'economic realities test,'

---

[184] *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014)
(addressing Title VII claim); *see also Sacchi v. IHC Health Servs.*, 918 F.3d 1155, 1158
(10th Cir. 2019) (noting both Title VII and the ADEA require an employment
relationship).

[185] *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991).

[186] *Knitter*, 758 F.3d at 1225.

[187] *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 961 (10th Cir. 2021) (quoting
*Knitter*, 758 F.3d at 1225–26).

[188] *Knitter*, 758 F.3d at 1226.

which asks whether the worker is in business for himself 'as a matter of economic fact.'"[189]

Next, "the joint employer test, not the hybrid test, is the appropriate test to use when an employee of one entity seeks to hold another entity liable as an employer."[190] Under this test, "two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment."[191] "Both entities are employers if they both exercise significant control over the same employees."[192] "An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer within the scope of Title VII."[193]

Finally, the single employer test permits "a plaintiff who is the employee of one entity . . . to hold another entity liable by arguing that the two entities effectively constitute a single employer."[194] "Although [the joint employer and single employer] tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise,

---

[189] *Id.* (quoting *Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir. 1992)).

[190] *Id.*

[191] *Adams*, 30 F.4th at 961 (internal quotation marks omitted).

[192] *Id.* (internal quotation marks omitted).

[193] *Id.* (citation omitted).

[194] *Knitter*, 758 F.3d at 1226 (alternation in original) (citation omitted).

while the joint-employer test assumes that the alleged employers are separate entities."[195]

Here, it is undisputed Dr. Garvey was an employee of Ogden Clinic at the time of her termination.  But she contends she was *also* an employee of the Hospital for purposes of Title VII and the ADEA "by virtue of the PSA and the control exercised by the Hospital in requiring her to abide by the Bylaws, Rules, Regulations, and policies of the Medical Staff and Hospital."[196]  And she claims both defendants unlawfully discharged her based on her sex and age.[197]  The Tenth Circuit has applied the joint employer test where, as here, a plaintiff is employed by one entity to perform services for another entity.[198]  Under these circumstances, the joint employer test appears applicable.[199]

---

[195] *Id.* at 1226–27 (alteration in original) (citation omitted).

[196] (Opp'n to Hospital MSJ 22, Doc. No. 140.)

[197] (Am. Compl. ¶¶ 162, 170–71, Doc. No. 45.)

[198] *See Knitter*, 758 F.3d at 1227–28 (concluding the joint employer test applied to determine whether the plaintiff employed by a "handyman company" was also an employee of the property management company where she exclusively performed services, because "[n]o one has alleged that [the management company] and [handyman company] constitute a single employer, and the parties do not dispute that Ms. Knitter was an employee of [the handyman company] rather than an independent contractor to any entity").

[199] Dr. Garvey did not expressly mention the joint employer test in her opposition brief or cite authority applying this test; instead, she cited a Tenth Circuit decision analyzing whether a plaintiff was an independent contractor or an employee (i.e., the hybrid test). (Opp'n to Hospital MSJ 22–23, Doc. No. 140 (citing *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018)).)  After the hearing, Dr. Garvey filed a notice of supplemental authority citing *Adams v. C3 Pipeline Construction*, a Tenth

However, both Dr. Garvey and the Hospital cited cases applying the hybrid test in their summary judgment briefing.[200]  The primary case the Hospital relies on is *Benaissa v. Salina Regional Health Center*,[201] an unpublished Tenth Circuit case applying to the hybrid test to determine whether a surgeon was an employee of a hospital, where the surgeon was paid by a third-party vendor which contracted with the hospital.  But the *Benaissa* court declined to consider the joint employer test only because the plaintiff failed to argue it before the district court—not because it was inapplicable to the underlying facts.[202]

Where both parties rely on cases applying the hybrid test, but the joint employer test also appears applicable based on Dr. Garvey's allegations and arguments, both

---

Circuit decision applying the joint employer test.  (*See* Notice of Suppl. Auth., Doc No. 149 (citing *Adams*, 30 F.4th at 960–61).)  The Hospital filed a response arguing the notice should be disregarded because the joint employer test was a "new claim" Dr. Garvey failed to allege in her amended complaint—and failed to raise in her opposition brief or at the hearing.  (Def. Ogden Reg'l Med. Ctr.'s Resp. to Notice of Suppl. Auth. 1, Doc. No. 150.)  But while Dr. Garvey does not use the words "joint employer," in her amended complaint, she alleges *both* defendants "discharged" her based on her sex and age.  (Am. Compl. ¶¶ 162, 170–71, Doc. No. 45.)  Likewise, she argued in her opposition brief and at the hearing that both defendants were her employer.  (*See* Opp'n to Hospital MSJ 23, Doc. No. 140.)  Accordingly, this theory was adequately raised in Dr. Garvey's pleadings, briefing, and oral argument—before she filed of the notice of supplemental authority.

[200] (*See* Hospital MSJ 38–39, Doc. No. 120 (citing *Benaissa v. Salina Reg'l Health Ctr., Inc.*, Nos. 20-3236 & 21-3015, 2021 U.S. App. LEXIS 35666 (10th Cir. Dec. 2, 2021) (unpublished)); Opp'n to Hospital MSJ 22–23, Doc. No. 140 (citing *Acosta*, 884 F.3d 1225).)

[201] 2021 U.S. App. LEXIS 35666.

[202] *See id.* at *11–12.

tests are considered.[203]  However, Dr. Garvey fails to raise a triable dispute of fact

under either test.

      ii.  Hybrid Test Analysis

Dr. Garvey has not provided sufficient evidence for a reasonable jury to conclude

she was an employee of the Hospital at the time of her termination under the hybrid

test.  Under the hybrid test, "the focus of the inquiry is the employer's right to control the

'means and manner' of the worker's performance."[204]  Other factors courts consider

include:

> (1) the kind of occupation, with reference to whether the work usually is
> done under the direction of a supervisor or is done by a specialist without
> supervision; (2) the skill required in the particular occupation; (3) whether
> the "employer" or the individual in question furnishes the equipment used
> and the place of work; (4) the length of time during which the individual has
> worked; (5) the method of payment, whether by time or by the job; (6) the
> manner in which the work relationship is terminated; i.e., by one or both
> parties, with or without notice and explanation; (7) whether annual leave is
> afforded; (8) whether the work is an integral part of the business of the
> "employer"; (9) whether the worker accumulates retirement benefits; (10)
> whether the "employer" pays social security taxes; and (11) the intention of
> the parties.[205]

No single factor is conclusive; rather, courts look at the totality of circumstances

surrounding the working relationship between the parties.[206]

---

[203] The single employer test is inapplicable, where there is no allegation Ogden Clinic
and the Hospital operated as an integrated enterprise.

[204] *Oestman*, 958 F.2d at 305.

[205] *Id.* (citation omitted).

[206] *Lambertsen v. Utah Dep't of Corr.*, 79 F.3d 1024, 1028 (10th Cir. 1996).

Although both Dr. Garvey and the Hospital cite cases applying the hybrid test, they make only conclusory arguments regarding Dr. Garvey's employment status. The Hospital merely cites its own officers' testimony stating Dr. Garvey was not an employee.[207] Notably, neither party expressly addresses the hybrid test factors. But where Dr. Garvey bears the burden of proof on this issue, she must identify evidence sufficient to raise a triable dispute of fact regarding whether she was an employee.[208] She has not done so.

As noted, the Hospital relies on *Benaissa*,[209] a case in which the Tenth Circuit applied the hybrid test in circumstances similar to those presented here. In that case, a hospital obtained the services of an orthopedic surgeon by contracting with a third-party vendor.[210] The vendor (which classified the surgeon as an independent contractor) assigned the surgeon to the hospital for orthopedic coverage while the hospital searched for a permanent surgeon.[211] After a year, the hospital gave notice pursuant to its contract with the vendor that it no longer wished to schedule the surgeon's

---

[207] (*See* Hospital MSJ 39, Doc. No. 120; Ex. 1 to Hospital MSJ, Roos Dep. 22:13–15, Doc. No. 121-1; Ex. 2 to Hospital MSJ, Dep. of Mark Adams 45:4–6, Doc. No. 121-2.) The Hospital also cites Dr. Garvey's deposition, but the cited testimony does not address whether she was an employee of the Hospital. (*See* Ex. 5 to Hospital MSJ, Garvey Dep. 38:14–16, Doc. No. 121-5 (stating she started taking call at the Hospital in September 1998).)

[208] *See McKnight*, 149 F.3d at 1128.

[209] 2021 U.S. App. LEXIS 35666.

[210] *Id.* at *2.

[211] *Id.* at *2, 6.

services.[212]  The surgeon then brought a Title VII discrimination claim against the

hospital.[213]

The district court granted summary judgment to the hospital, concluding the

surgeon was not an employee of the hospital under the hybrid test.[214]  The district court

determined the following facts were "inconsistent with employee status":

> Dr. Benaissa was a highly skilled, experienced, board-certified orthopedic
> surgeon who was licensed in eleven states.  He agree[d] that he had
> complete autonomy in determining what work needed to be done for his
> patients.  SRHC had written employment agreements with all its employed
> physicians, but no written employment agreement with Dr. Benaissa; the
> only written contract was between SRHC and LT for the provision of
> services by [LT's] independent contractors.  SRHC had contacted LT about
> a short-term placement for an orthopedic surgeon, and Dr. Benaissa
> performed services at SRHC for one year before SRHC terminate[d] its
> scheduled services with [him].  LT paid him; SRHC did not.  SRHC did not
> provide him with any benefits . . . such as health and dental insurance,
> retirement benefits, or paid time off.  And both SRHC and Dr. Benaissa
> treated his taxes as if [he] was an independent contractor.[215]

The district court concluded the surgeon's use of the hospital's tools and

premises for his work was "not a reliable indicator of employee status in this case

because the use of such items is inherent in the medical field, regardless of whether a

doctor is a hospital employee or simply has privileges at the hospital."[216]  Likewise, the

---

[212] *Id.* at *2.

[213] *Id.*

[214] *Id.* at *1, 4–8.

[215] *Id.* at *6 (alterations in original) (emphasis omitted) (internal quotation marks and
citations omitted).

[216] *Id.* at *6–7 (internal quotation marks omitted).

court concluded the fact that the surgeon's work was part of the hospital's business was an unreliable indicator of employee status because "the same would be true of both an employed physician and one who simply has privileges" at the hospital.[217]  The Tenth Circuit affirmed the district court's analysis under the hybrid test and its conclusion that the surgeon was not an employee of the hospital.[218]

Like the plaintiff in *Benaissa*, Dr Garvey is a highly skilled, experienced trauma surgeon.  And as in *Benaissa*, the Hospital and Dr. Garvey had no written employment agreement; instead, the Hospital contracted with Ogden Clinic for trauma call services. Ogden Clinic, not the Hospital, paid Dr. Garvey.  And there is no evidence the Hospital provided Dr. Garvey with benefits such as health insurance, retirement benefits, or paid time off, or that it paid social security taxes for her.  With respect to the intentions of the parties, the Hospital's officials testified Dr. Garvey was not an employee, and Dr. Garvey fails to cite contrary evidence showing an employment relationship was intended.  All these factors weigh against a finding that Dr. Garvey was an employee of the Hospital.

The other hybrid test factors are unreliable indicators of employment status under the circumstances here.  As in *Benaissa*, Dr. Garvey's use of the Hospital's tools and premises, and the fact that her work was part of the Hospital's business, do not necessarily indicate an employment relationship, where the same would be true of both

---

[217] *Id.* at *7 (internal quotation marks omotted).

[218] *Id.* at *9–10, 15–16.

employed physicians and physicians who merely hold privileges.  For the same reason, the length of time she worked at the Hospital (more than twenty years) is not determinative.

Finally, Dr. Garvey focuses on the "control exercised by the Hospital in requiring her to abide by the Bylaws, Rules, Regulations, and policies of the Medical Staff and Hospital."[219]  But again, both employed physicians and physicians who merely hold privileges would be subject to these policies.  This evidence is insufficient, on its own, to support a finding that Dr. Garvey was an employee.

In sum, Dr. Garvey fails to present evidence sufficient for a reasonable jury to find she was an employee of the Hospital under the hybrid test.

### iii. Joint Employer Test Analysis

Dr. Garvey also fails to present sufficient evidence for a reasonable jury to conclude she was an employee of the Hospital under the joint employer test.

Under the joint employer test, the "[m]ost important" factor in determining "control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances."[220]  Other factors courts consider include "the ability to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; day-to-day supervision of employees, including

---

[219] (Opp'n to Hospital MSJ 22–23, Doc. No. 140.)

[220] *Adams*, 30 F.4th at 961.

employee discipline; and control of employee records, including payroll, insurance, taxes and the like."[221]

The Tenth Circuit's decision in *Knitter v. Corvias Military Living*[222] is instructive here. In that case, the plaintiff worked for a "handyman company" that operated as an independent contractor for a property management company.[223] Nearly all the handyman company's business came from the property management company, and the plaintiff performed services exclusively for the property management company.[224] After the plaintiff complained about sexual harassment, the property management company instructed the handyman company not to send the plaintiff to its properties anymore.[225] The handyman company then terminated the plaintiff.[226] The plaintiff brought Title VII claims against the property management company for discrimination and retaliation.[227] The Tenth Circuit affirmed the district court's grant of summary judgment to the property management company based on its determination that the plaintiff was not an employee.[228] The court found the property management company lacked authority to

---

[221] *Id.* (citation omitted).

[222] 758 F.3d 1214.

[223] *Id.* at 1217, 1219.

[224] *Id.*

[225] *Id.* at 1223.

[226] *Id.*

[227] *Id.* at 1217–18.

[228] *Id.* at 1218.

fire the plaintiff, even if its request to no longer send her to its properties effectively forced the handyman company to terminate her.[229]  The court also noted the handyman company had exclusive control over the plaintiff's payment, and the degree of supervision exercised by the property management company (including safety-related supervision) was indicative of a client-vendor relationship rather than an employer-employee relationship.[230]

Like the plaintiff in *Knitter*, the Hospital's decision to bar Dr. Garvey from the trauma call rotation resulted in her termination by Ogden Clinic.  But Dr. Garvey fails to present evidence that the Hospital had direct authority to terminate her, rather than simply barring her from performing call services *at the Hospital*.  (Furthermore, it is undisputed that Dr. Garvey maintained privileges at the Hospital even after she was barred from the trauma call rotation.)[231]  As in *Knitter*, Dr. Garvey was paid by Ogden Clinic, not the Hospital.  Dr. Garvey presents no evidence the Hospital controlled records concerning her payroll, insurance, or taxes.  And while Dr. Garvey contends the Hospital exercised control over her by requiring her to abide by its policies, this does not necessarily indicate an employment relationship where the same would be required of any physician who held privileges at the Hospital.  Accordingly, this evidence is

---

[229] *Id.* at 1228–29.

[230] *Id.* at 1229–30.

[231] (*See* Hospital MSJ, SUF ¶ 27, Doc. No. 120.)

insufficient for a reasonable jury to find Dr. Garvey was an employee of the Hospital under the joint employer test.

Because Dr. Garvey fails to present evidence sufficient for a reasonable jury to find she was an employee of the Hospital under either the hybrid test or the joint employer test, the Hospital is entitled to judgment as a matter of law on Dr. Garvey's claims under Title VII and the ADEA.

### 2. Discrimination Claims Against Ogden Clinic

To prevail on a discrimination claim under Title VII and the ADEA, the "plaintiff bears the ultimate burden of proving her employer intentionally discriminated against her" through either direct or circumstantial evidence.[232]  If a party relies on circumstantial evidence (as Dr. Garvey does), the burden-shifting framework in *McDonnell Douglas Corp. v. Green*[233] applies.[234]  Under this framework, the plaintiff must establish a prima facie case of discrimination by demonstrating, "by a preponderance of the evidence," that (1) "she is a member of a protected class"; (2) "she suffered an adverse employment action"; and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination."[235]

---

[232] *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

[233] 411 U.S. 792, 802–05 (1973).

[234] *See Bennett*, 792 F.3d at 1266.

[235] *Id.*

If the plaintiff can establish a prima facie case of discrimination, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions."[236]  If the employer does so, the burden shifts back "to the plaintiff to show that the defendant's explanation was merely pretextual."[237]  To determine pretext, the court considers

> whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.[238]

i.  Prima Facie Case

It is undisputed Dr. Garvey meets the first two elements of a prima facie case under Title VII and the ADEA: she is a member of a protected class based on her gender and age, and she suffered an adverse employment action (termination).[239]  But Ogden Clinic argues Dr. Garvey cannot establish the third element of a prima facie case

---

[236] *Id.*

[237] *Id.*

[238] *Simmons v. Sykes Enters.*, 647 F.3d 943, 947–48 (10th Cir. 2011) (citation omitted).

[239] (*See* Ogden Clinic MSJ 19, Doc. No. 116.)  Ogden Clinic notes that although Dr. Garvey resigned, there is no dispute that she would have been terminated had she chosen not to resign.  (*Id.* at 19 n.4.)  And Ogden Clinic acknowledges that courts widely consider resignation in lieu of termination to be an adverse employment action for purposes of Title VII and the ADEA.  (*Id.*); *Sanchez v. Alcon Vision, LLC*, No. 2:22-cv-2336, 2024 U.S. Dist. LEXIS 87530, at *17 n.39 (D. Kan. May 15 2024) (unpublished); *Coates v. Adams Cnty. Sheriff's Off.*, 631 F.Supp.3d 976, 987 (D. Colo. 2022).

because "there are no circumstances [Dr. Garvey] can show that give rise to an inference of discrimination."[240]  Ogden Clinic asserts the fact that it hired a younger male surgeon to fill Dr. Garvey's position is insufficient.[241]

Ogden Clinic is incorrect.  As the Tenth Circuit recently explained, to establish a prima facie case under the *McDonnell Douglas* framework, "a plaintiff alleging wrongful termination may raise an inference of unlawful discrimination by showing that (1) she is a member of a protected class, (2) she was qualified for her job, (3) she was fired, and (4) the job was not eliminated."[242]  It is undisputed Dr. Garvey is a member of a protected class, she was qualified for her job, she was terminated, and her position was not eliminated—Ogden Clinic replaced her with another surgeon.[243]  Therefore, Dr. Garvey has established a prima facie case of discrimination under Title VII and the ADEA.

### ii.  Legitimate Nondiscriminatory Reason

Ogden Clinic asserts it had a legitimate business reason for terminating Dr. Garvey—namely, she was in breach of her employment agreement because the Hospital prohibited her from taking trauma call shifts.[244]  Dr. Garvey argues Ogden

---

[240] (Ogden Clinic MSJ 19, Doc. No. 116.)

[241] (*Id.* at 20.)

[242] *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1335 (10th Cir. 2025).

[243] (*See* Ogden Clinic MSJ 19–20, Doc. No. 116.)

[244] (*See id.* at 20.)

Clinic's proffered reason was not *legitimate*, because (1) the Hospital's demand that she be removed from the trauma call rotation was improper and contrary to the PSA, (2) allowances were made for other surgeons who were unavailable to participate in trauma call rotation, and (3) she never missed a scheduled trauma call shift.[245]

At the second step of the *McDonnell Douglas* framework, Ogden Clinic is not required to "litigate the merits of [its] reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion."[246]  Rather, Ogden Clinic need only "articulate a reason for the [termination] that is not, on its face, prohibited and that is reasonably specific and clear."[247]  This is an "exceedingly light" burden.[248]

Ogden Clinic's proffered reason for terminating Dr. Garvey—that she was in breach of her employment agreement when the Hospital disallowed her from participating in trauma call—meets this standard.[249]  Accordingly, Ogden Clinic has satisfied its burden to articulate a legitimate, nondiscriminatory reason for the termination.

---

[245] (Opp'n to Ogden Clinic MSJ 29–30, Doc. No. 132.)

[246] *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (citation omitted).

[247] *Id.* (internal quotation marks omitted).

[248] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (citation omitted).

[249] *See, e.g.*, *Brahmamdam v. TriHealth, Inc.*, No. 1:19-cv-152, 2022 U.S. Dist. LEXIS 87437, at *26 (S.D. Ohio May 16, 2022) (unpublished) (finding breach of an employment agreement constitutes a legitimate, nondiscriminatory reason for termination).

iii. Pretext

Ogden Clinic next argues Dr. Garvey cannot prove its reason for terminating her was pretextual.[250]  Specifically, Ogden Clinic asserts Dr. Garvey has "no evidence that her termination was sex or age based."[251]  It also argues male physicians Dr. Garvey identified as receiving better treatment were not prohibited from taking trauma call in violation of their employment agreements.[252]  Finally, it argues "there is no evidence to suggest the younger surgeon hired to replace [Dr. Garvey] was less qualified than [her] and was hired because of his age."[253]

Dr. Garvey does not expressly address pretext in her opposition, but her arguments regarding the prima facie case and the legitimacy of Ogden Clinic's articulated reasoning apply equally to (or may even be better suited for) this third step of the *McDonnell Douglas* framework.  Accordingly, those arguments are considered at this step.

As an initial matter, Dr. Garvey need not present affirmative evidence of discrimination to prevail at this step.  The Tenth Circuit has "definitively rejected a 'pretext plus' standard that requires a plaintiff to 'provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered

---

[250] (Ogden Clinic MSJ 20–22, Doc. No. 116.)

[251] (*Id.* at 21.)

[252] (*Id.* at 21–22.)

[253] (*Id.* at 22.)

explanation is pretextual."[254]  In other words, "[t]he plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination."[255]

As noted above, pretext can be "inferred from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation."[256]  Pretext is typically demonstrated in one of three ways: "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice."[257]  "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that [she] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[258]  But "[a] plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual."[259]  "The critical question regarding this aspect of the *McDonnell Douglas*

---

[254] *Walkingstick Dixon*, 125 F.4th at 1337 (internal quotation marks omitted).

[255] *Id.* (citation omitted)

[256] *Id.* (citation omitted).

[257] *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citations omitted).

[258] *Id.*

[259] *Walkingstick Dixon*, 125 F.4th at 1337 (citation omitted).

rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-[discriminatory] reasons."[260]

Dr. Garvey points to four potential factual bases which may support a finding of pretext: (1) Ogden Clinic's failure to conduct an investigation before terminating her; (2) Ogden Clinic's failure to enforce the PSA, which she contends did not permit the Hospital to preclude her from the trauma call rotation; (3) Ogden Clinic's prior accommodation of other physicians who were unable to participate in the trauma call rotation; (4) the fact that she never missed a scheduled trauma call shift; and (5) her own testimony that Ogden Clinic had terminated other female physicians for "no reason."[261]

### a.  Failure to Conduct an Investigation

Dr. Garvey contends Ogden Clinic acted contrary to its own policy and practices for handling complaints about its physicians when it failed to investigate the Hospital's allegations regarding her behavior.[262]  She contends five male physicians were treated differently because Ogden Clinic investigated allegations of misconduct or performance

---

[260] *Id.* (citation omitted).

[261] (*See* Opp'n to Ogden Clinic MSJ 26–30, Doc. No. 132.)  As noted, Dr. Garvey raises these arguments in her discussion of the first two *McDonnell Douglas* steps, but they are appropriately considered at this third step.

[262] (*See id.* at 26–28.)

issues relating to those physicians to determine whether employment consequences were warranted.[263]

Dr. Garvey has not shown any male physicians who were investigated are relevant comparators.  The Ogden Clinic official who testified on this topic indicated one male physician was "monitored" due to prior drug use; another was investigated due to sexual harassment allegations; and a third was terminated for sexual misconduct.[264] He also testified that a fourth male physician who was "ornery and cantankerous" was not being monitored.[265]  (It is unclear who the fifth male physician referenced in Dr. Garvey's briefing is.)  But there is no evidence the Hospital barred any of these physicians from participating in the trauma call rotation, as it did Dr. Garvey.  And Dr. Garvey fails to identify any other Ogden Clinic physician who was investigated (or otherwise treated differently than she) after being barred from trauma call rotation by a hospital.

Dr. Garvey fails to present other evidence that Ogden Clinic had a policy or practice of investigating under the circumstances of her termination.  Although Ogden Clinic officials confirmed there was a policy or practice of investigating complaints about

---

[263] (*Id.* at 28.)

[264] (Ex. 2(B) to Opp'n to Ogden Clinic MSJ, Porter Dep. 186:5–20, 187:9–188:5, 188:12–22, Doc. No. 136 at 136–48 (sealed).)

[265] (*Id.* at 186:21–187:8.)

physicians,[266] Dr. Garvey's supervisor testified she was not investigated before termination because "the issues with Dr. Garvey have to do with her not being able to take call at the hospital."[267]  As explained in section B.1, Ogden Clinic had no contractual obligation (express or implied) to investigate the Hospital's reasons for this decision, or to contest the Hospital's decision.  And Dr. Garvey provides no other evidence suggesting it was Ogden Clinic's policy or practice to investigate in these circumstances—where the Hospital notified Ogden Clinic it would no longer allow a particular physician to participate in the trauma call rotation.  Accordingly, Ogden Clinic's failure to investigate the Hospital's allegations regarding Dr. Garvey is not evidence of pretext.

> b.  *Failure to Enforce the PSA*

Dr. Garvey next argues Ogden Clinic failed to enforce the PSA by improperly allowing the Hospital to control which physicians could provide trauma call services.  As explained in section B.1, where the PSA did not prohibit the Hospital from barring a physician from participating in the trauma call rotation, Ogden Clinic's acquiescence to the Hospital's decision does not evidence pretext.

---

[266] (*See* Ex. 10 to Opp'n to Ogden Clinic MSJ, Dep. of Valerie Kierejewski 32:23–33:11, 34:7–11, Doc. No. 135 at 155–211; Ex. 11 to Opp'n to Ogden Clinic MSJ, Dep. of Mitch Payne ("Payne Dep.") 59:24–60:6, Doc. No. 135 at 212–62.)

[267] (Ex. 11 to Opp'n to Ogden Clinic MSJ, Payne Dep. 60:7–13, Doc. No. 135 at 212–62.)

### c.  Accommodation of Other Physicians' Absences

Dr. Garvey next contends she was treated differently than other Ogden Clinic physicians who were unable to participate in the trauma call rotation for extended periods.[268]  Specifically, Dr. Garvey testified one male physician had his shifts covered for a year during a military deployment, and two female physicians had their shifts covered while they were pregnant and had young children, for one year and three years, respectively.[269]

Dr. Garvey fails to demonstrate these are relevant comparators.  These physicians' absences, while lengthy, were temporary.  Unlike these physicians, Dr. Garvey was barred *by the Hospital* from participating in the trauma call rotation—with no indication the bar was temporary.  Ogden Clinic's decision to terminate Dr. Garvey rather than requiring other physicians to cover all trauma call shifts for her on a permanent basis was not inconsistent with its prior accommodation of other physicians' temporary absences.

### d.  No Missed Call Shifts

Dr. Garvey next contends the fact that she had never missed a trauma call shift undermines Ogden Clinic's stated reasons for terminating her.[270]  But Ogden Clinic has never claimed it terminated Dr. Garvey for missing trauma call shifts.  Instead, it

---

[268] (Opp'n to Ogden Clinic MSJ 29–30, Doc. No. 132.)

[269] (*See* Ex. 1 to Opp'n to Ogden Clinic MSJ, Garvey Dep. 106:9–19, 107:6–14, Doc. No. 135 at 4–57.)

[270] (Opp'n to Ogden Clinic MSJ 30, Doc. No. 132.)

explains she was terminated because the Hospital barred her from participating in the trauma call rotation.  The fact that Dr. Garvey had never missed a shift is not inconsistent with Ogden Clinic's proffered reason for the termination.  Accordingly, it is not evidence of pretext.

### e.   *Termination of Other Female Physicians*

Finally, Dr. Garvey points to her own testimony that Ogden Clinic terminated other female physicians for "no reason."[271]  Specifically, she stated "multiple other female employees in [her] age category [] have also been terminated for essentially no reason," and "[m]ost women in their mid-50s at Ogden Clinic disappear."[272]  But Dr. Garvey provided little further information regarding the circumstances of their terminations.  And she cites no other evidence that Ogden Clinic terminated other female physicians in her age category.  Dr. Garvey's own vague and unsupported testimony on this issue is insufficient to sustain a finding of any discriminatory practice by Ogden Clinic.

For all these reasons, Dr. Garvey fails to identify evidence sufficient for a reasonable jury to conclude Ogden Clinic's stated reason for terminating her was pretextual.  Accordingly, Ogden Clinic is entitled to judgment as a matter of law on Dr. Garvey's discrimination claims under Title VII and the ADEA.

---

[271] (*Id.* at 28.)

[272] (Ex. 1 to Opp'n to Ogden Clinic MSJ, Garvey Dep. 81:19–21, 82:5–6, Doc. No. 135 at 4–57.)

**CONCLUSION**

Defendants' motions for summary judgment[273] are granted, and summary judgment is entered in favor of Defendants on all claims.

DATED this 14th day of April, 2025.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge

---

[273] (Doc. Nos. 116 & 120.)